NOT RECOMMENDED FOR FULL TEXT PUBLICATION
File Name: 11a0658n.06

No. 09-2350

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Sep 07, 2011*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATE OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| WILLIAM ERIC BELL, | ) | MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE: KENNEDY, SILER, and McKEAGUE, Circuit Judges.

**CORNELIA G. KENNEDY, Circuit Judge.** Defendant William Eric Bell pleaded guilty to maintaining a drug-involved premises in violation of 21 U.S.C. § 856(a)(1) and (b). He now challenges his 57-month sentence as procedurally unreasonable because the district court assessed a two-level firearm enhancement under the Sentencing Guidelines and declined to decrease his Guideline offense level for acceptance of responsibility. For the reasons that follow, we **AFFIRM**.

## FACTUAL AND PROCEDURAL BACKGROUND

At his change-of-plea hearing, Bell admitted the crux of his criminal conduct: "[W]hat I did that makes me guilty of this charge is for three weeks at the end of January of this year [2009] I allowed my son, Scott Milliron, to undertake this meth[amphetamine]-making operation of his [in my home] with me knowing fully well aware of what he was up to." Bell continued, "I wasn't aware of the scope at which it was going to be undertaken and I hated that[,] but at the same time at 125 Elsmere, my home that I maintained, my son did, in fact, conduct illegal activity maintaining and

operating a meth[amphetamine] lab, and I did knowingly understand what he was doing and knew he was doing it. I received meth[amphetamine] in exchange for what he was doing."

Bell's criminal activities were discovered through investigations of his son. In early 2009, investigators received information from a confidential source that Milliron was distributing methamphetamine in the Kalamazoo, Michigan area. In response, on January 27, 2009, officials conducted a controlled methamphetamine transaction with Milliron, arrested him and searched his vehicle. They then executed multiple warrant and consent-based searches of Milliron's residences and other premises believed to have been involved in his methamphetamine production and distribution enterprise. One of those premises was 125 Elsmere Street, Parchment, Michigan—Bell's personal residence.

During a January 29, 2009 consent search of Bell's home, investigators uncovered evidence of a methamphetamine operation in the basement, including: drug production precursors and equipment; currency; and a ledger replete with names, dollar amounts, and pill tabulations. They also seized a loaded .357 Ruger handgun that they found concealed in a box near the methamphetamine laboratory.

Bell admitted to the officers that he permitted Milliron to cook methamphetamine in the basement "two times per week," but did not provide specific dates of the operation. Bell also admitted to observing Milliron cook the methamphetamine in the basement and weighing it in the kitchen. In exchange for his use of Bell's basement for manufacturing methamphetamine, Milliron provided Bell with quantities of the drug for his personal use. Bell also sold some of the methamphetamine he received from Milliron to his friends. As for the firearm, Bell knew that the handgun seized from the basement had been in his house, but denied ownership of it. Bell claimed

to have found the handgun "approximately two weeks" prior to the consent search, while he was moving items in the basement. Upon discovering the handgun, Bell concealed it in a box in the basement.

Bell provided additional information regarding the methamphetamine operation during a June 9, 2009 presentence interview. Bell admitted to giving Milliron a key to his house, which allowed Milliron to cook methamphetamine in Bell's basement undisturbed "for periods totaling approximately three weeks," between November 2008 and the date of the search, January 29, 2009. Each time Milliron cooked methamphetamine, he provided Bell with four or five grams of it. Bell denied assisting Milliron with the "cooks," however, and claimed that he had no knowledge of Milliron's production method.

Milliron's own description of Bell's involvement in the methamphetamine production, which Milliron recounted at a presentence interview subsequent to Bell's, differed from his father's. According to Milliron, Bell supplied Milliron with pseudoephedrine pills, which can be used as precursor ingredients in the manufacture of methamphetamine. Further, Bell was allegedly the "main supplier of precursor items for [a confederate of Milliron's] to manufacture methamphetamine." Milliron further indicated that Bell "wanted" Milliron to cook methamphetamine at Bell's residence. Finally, Milliron alleged that Bell introduced Milliron to a known methamphetamine cook, who eventually taught Milliron a more efficient cooking method. Because of these discrepancies, the pre-sentence report ("PSR") prepared by the Probation Officer who interviewed both Bell and Milliron recommended that Bell's offense level under the Guidelines be enhanced for obstruction of justice, enhanced for possession of a dangerous weapon during a drug offense, and not reduced for acceptance of responsibility as Bell requested.

Prior to and at his October 8, 2009 sentencing, Bell lodged objections to the proposed possession-of-a-dangerous weapon enhancement, obstruction-of-justice enhancement, and denial of the acceptance-of-responsibility decrease. Regarding the weapon enhancement, Bell premised his objection on several uncontested facts: (1) he did not own the firearm, which was registered to another person; (2) Milliron brought the firearm into Bell's residence, unbeknownst at the time to Bell; and (3) Bell never used the firearm and did not know that it was present in his home until two weeks before law enforcement officers located it. Regarding the acceptance of responsibility and obstruction of justice issues, Bell argued that the Probation Officer's recommendation on these points was primarily based on the discrepancies between his description of the methamphetamine operation and Milliron's, and he questioned Milliron's credibility. He also pointed out that he had participated in a proffer interview and had been the beneficiary of a U.S.S.G. § 5K1.1 motion by the government owing to his substantial assistance in the investigation of Milliron, which he asserted should weigh in his favor on these issues as well. For its part, the government acknowledged Bell's cooperation and agreed that a reduction for substantial assistance was warranted, but took no position regarding Bell's purported minimization of his role in the methamphetamine operation because that occurred at a meeting between Bell and a Probation Officer without the government's presence.

When the district court considered Bell's objection to the weapon enhancement, it questioned Bell as to whether the firearm was found "in close proximity" to the methamphetamine lab. Bell conceded that it was. The court then observed that "for some period of time," Bell knew that the weapon was in his basement, and that methamphetamine was being manufactured in that location. The court noted that the firearm remained in the basement—with Bell's knowledge—until the basement was searched by law enforcement personnel. Later, when ruling on the firearm

enhancement, the district court concluded that, "at the very least, [Bell] was in constructive possession of the firearm while it was in the basement," and that the firearm was found "close to the location in the basement of the methamphetamine operation." The court ruled that Bell had not met his burden to show that it was "clearly improbable" that the firearm was related to the drug offense. To the contrary, in the district court's view, it was "crystal clear that this weapon was there to facilitate protection of the methamphetamine operation, if necessary."

As for the obstruction of justice and acceptance of responsibility issues, the district court sustained the objection to the obstruction enhancement, but overruled the objection regarding acceptance of responsibility without accepting the government's offer to put on proofs. The court noted that, although Milliron was an odious person, the parties had accepted as true his statements regarding drug quantities.[1] The court accordingly accepted those uncontested quantities, and determined that there was no reason to doubt Milliron's other statements regarding Bell's participation in methamphetamine production. Specifically, the court remarked "My quandry is: Mr. Milliron apparently is dead on on drug quantity, but then he is the worst thing since the Edsel after that." The district court found that the PSR was accurate concerning Bell's denial of having assisted Milliron with manufacturing methamphetamine, and denied Bell an acceptance-of-responsibility offense-level decrease based on "the totality of the report" of the presentence interview. The rulings on the objections resulted in an adjusted Sentencing Guideline range of 78 to 97 months.

The district court granted the government's motion for downward departure based on Bell's assistance to the government in investigating Milliron and granted the government's request for a

---

[1]This was despite the government's argument at the sentencing hearing that it would not have relied on testimony by Milliron to counter statements made by Bell.

three-level reduction. Addressing Bell's contention that granting the government's motion and denying him an acceptance of responsibility Guideline reduction would be inconsistent, the district court stated:

> A 5K motion goes to substantial assistance to the government in the prosecution of another. And from the government's perspective, Mr. Bell has been truthful in that regard. Acceptance of responsibility is a different matter. It's acceptance of responsibility of your own conduct, so there is not necessarily a collision between these two concepts. Admittedly a rare circumstance, but under the circumstances here, I don't see an inconsistency in not granting acceptance and granting a 5K motion for the reasons that I've stated.

The district court's rulings on the motions resulted in a final Guidelines range of 57 to 71 months' imprisonment. The court sentenced Bell to 57 months, and Bell timely appealed.

## ANALYSIS

Bell argues on appeal that his sentence is procedurally unreasonable because the district court incorrectly assessed a firearm enhancement to his Guideline sentence and improperly denied Bell a decrease for acceptance of responsibility. We review the district court's sentencing determinations for reasonableness, using a deferential abuse-of-discretion standard. *United States v. Martinez*, 588 F.3d 301, 324 (6th Cir. 2009) (citing *Gall v. United States*, 552 U.S. 38, 56 (2007), *Rita v. United States*, 551 U.S. 338, 361 (2007), and *United States v. Booker*, 543 U.S. 220, 261 (2005)). The procedural component of the reasonableness equation requires that we "'ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence.'" *Id.* (quoting *Gall*, 552 U.S. at 51). The district court's decision "should be sufficiently detailed to reflect the considerations listed in § 3553(a) to permit meaningful appellate

6

review" and "must also provide some indication that the court considered the defendant's arguments in favor of a lower sentence and the basis for rejecting such arguments." *Id.* at 325 (citations and internal quotation marks omitted).

I.  Firearm Enhancement

Section 2D1.1(b)(1) of the Guidelines states that "[i]f a dangerous weapon (including a firearm) was possessed, increase [the offense level] by 2 levels." Application Note 3 explains that the enhancement "should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." The government bears the initial burden of proving by a preponderance of the evidence that "'(1) the defendant actually or constructively 'possessed' the weapon, and (2) such possession was during the commission of the offense.'" *United States v. Catalan*, 499 F.3d 604, 606 (6th Cir. 2007) (quoting *United States v. Hill*, 79 F.3d 1477, 1485 (6th Cir. 1996)). The burden then shifts to the defendant to show that it was "clearly improbable" that the firearm was connected to the offense. *Id*. If the defendant fails to meet his burden, "the district court should apply the enhancement." *Id*. at 606-07. "We review de novo the district court's legal interpretation of the Guidelines, including mixed questions of law and fact." *Id*. at 606 (internal quotation marks and citation omitted).

The government unquestionably met its burden. As noted, application of this enhancement requires two findings: that the defendant actually or constructively possessed the weapon and that such possession was during the commission of the offense. *Id*. Bell admitted that he possessed the weapon, though he denied ownership of it. But his denial of ownership is irrelevant—Bell unquestionably had control over the firearm and the premises where it was located, as evidenced by his secreting the weapon upon discovery. Consequently, he at least constructively possessed the

7

weapon, satisfying this prong of the enhancement. *See United States v. Galvan*, 453 F.3d 738, 742 (6th Cir. 2006) ("A defendant constructively possesses a gun if he has ownership, or dominion or control over the firearm itself, or dominion over the premises where the firearm is located." (internal quotation marks, alterations, and citation omitted)). Moreover, while Bell challenges the timing of his possession of the firearm in relation to Milliron's drug manufacturing operation, the district court did not err in concluding that the temporal proximity was sufficient given the imprecise nature of the dates provided for the laboratory's operation and the fact that the laboratory could have been restarted without difficulty.

Because the government met its burden of proving that Bell possessed the weapon at the time of the offense, it falls to Bell to prove that it is "clearly improbable" that the weapon was connected to the offense of maintaining a drug premises. In determining whether a firearm was related to a particular drug offense for purposes of § 2D1.1(b)(1), we consider such factors as "the proximity of the firearm to the drugs, the type of firearm involved, whether the firearm was loaded, and any alternative purpose offered to explain the presence of the firearm." *United States v. Moses*, 289 F.3d 847, 850 (6th Cir. 2002) (citing *Hill*, 79 F.3d at 1486). In this case, each of these factors weighs in favor of the enhancement. First and second, the firearm was a handgun located in a box in the basement near the methamphetamine production area, not a hunting rifle in a closet—a situation with a clearer non-criminal explanation. *See* U.S.S.G. § 2D1.1(b)(1), cmt. n.3. Third, the handgun was loaded. Fourth, the district court concluded that the alternative purpose offered to explain the presence of the firearm—that it was taken from Milliron's mother because she was suicidal—was unpersuasive. Indeed, the district court stated that it was "crystal clear" that the firearm was located in the basement because of the methamphetamine laboratory. We are further persuaded that the

8

enhancement was appropriate because when Bell discovered the firearm, instead of attempting to dispose of it or return it to Milliron, he secreted it in a box in the basement where he knew the drug laboratory was located.

For all of these reasons, the district court did not abuse its discretion in imposing a firearm enhancement onto Bell's Guideline offense level.

II.  Acceptance of Responsibility

Section 3E1.1(a) of the Guidelines permits a district court to reduce a defendant's offense level by two levels if the defendant "clearly demonstrates acceptance of responsibility for his offense."  It is the defendant's burden to prove, by a preponderance of the evidence, that the reduction is justified.  *United States v. Surratt*, 87 F.3d 814, 821 (6th Cir. 1996).  "A defendant who pleads guilty is not entitled to a reduction as a matter of right."  *Id*.  As the commentary to § 3E1.1 makes clear, although "[e]ntry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which he is accountable under § 1B1.3 . . . will constitute significant evidence of acceptance of responsibility[,] . . . . this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility."  U.S.S.G. § 3E1.1, cmt. n.3.

"The determination of whether a defendant has accepted responsibility is a factual question which should be accorded great deference and should not be disturbed unless clearly erroneous."  *Surratt*, 87 F.3d at 821.  A decision is clearly erroneous only if this court "is left with the definite and firm conviction that a mistake has been committed."  *United States v. Boudreau*, 564 F.3d 431, 435 (6th Cir. 2009) (citations and internal quotation marks omitted).  This highly deferential standard

9

of review reflects that "[t]he sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility." U.S.S.G. § 3E1.1, cmt. n.5.

On appeal, Bell argues what he argued to the district court, namely that he met his burden to receive the offense-level decrease. However, as noted, it is not the role of an appellate court to determine whether Bell met his burden to receive an acceptance-of-responsibility offense-level decrease. Instead, our role is to review for clear error the district court's factual determination that Bell was not entitled to the decrease. *See Surratt*, 87 F.3d at 821. So, putting aside Bell's assertions as to why he was entitled to the offense-level decrease *in initio*, we are essentially left with the argument that the district court committed clear error (1) because the Probation Officer wrongly concluded that Bell "minimized" his role in the criminal enterprise; (2) the Probation Officer reached this conclusion on the basis of erroneous facts obtained from Milliron during Milliron's pre-sentence interview; and (3) the Probation Officer wrongly chose to credit Milliron's statements about Bell's involvement in the criminal enterprise in her recommendation to the district court, especially without talking with Bell to clarify any inconsistencies.

Bell's complaints about the actions of the Probation Officer, namely that she concluded that he minimized his conduct on the basis of allegedly erroneous facts obtained from Milliron during Milliron's pre-sentence interview and that she wrongly chose to credit Milliron's statements about Bell's involvement in the criminal enterprise without talking with Bell to clarify any inconsistencies, are subsumed in his criticism of the district court for accepting these conclusions.[2] We do agree with

---

[2]The Probation Officer did not conclude that Bell minimized his role in the offense conduct of maintaining a drug-involved premises, but rather that he minimized his role vis-à-vis such things as supplying Milliron with precursor materials for methamphetamine production and his role in introducing Milliron to a confederate who taught Milliron a more efficient cooking method. Though the crime to which Bell pleaded guilty, 21 U.S.C. § 856(a)(1) and (b), makes it unlawful to

10

Bell that the district court apparently put great stock in the Probation Officer's conclusions about Bell's forthrightness regarding his criminal conduct without seeking to develop an independent record of sworn testimony. This is troublesome because the district court's failure to adduce such testimony leaves a somewhat thin evidentiary record for review. We might be inclined to remand the case if it were truly nothing but a "he said/she said" scenario with Bell and the Probation Officer disagreeing about whether Bell minimized his relevant conduct with no sworn testimony to support or refute the contention. But the district court did not accept the Probation Officer's conclusions without independently considering the facts gleamed from the respective pre-sentence interviews with an eye towards reconciling disparate assertions.

When considering Bell's objections to the PSR, the district court noted that the parties had accepted Milliron's statements regarding drug quantities as true and that this made Milliron's statements regarding Bell's involvement credible. As a result, the district court concluded that Milliron was truthful regarding Bell's conduct and that Bell had minimized his conduct when interviewed by the Probation Officer—or at least that Bell had failed to sustain his burden that he had not done so by the preponderance of the evidence. These conclusions—accepting the statements of one individual as true over another individual—are, without question, factual findings "which

---

"knowingly open, lease, rent, use, or maintain any place, whether permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance," the topics that Bell allegedly minimized fall within the "additional relevant conduct" ambit discussed in comment 1(A) to § 3E1.1. "Relevant conduct" is defined in part under § 1B1.3(a) as "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." In other words, while Bell's alleged conduct minimization did not concern the elements of the crime itself, it was sufficiently related to the charged crime such that the district court rightly considered the veracity and forthrightness of Bell's statements regarding this conduct in determining whether to grant him the reduction.

11

should be accorded great deference and should not be disturbed unless clearly erroneous." *Surratt*, 87 F.3d at 821. Here, the district court was presented with two factual scenarios: that Bell's role in the criminal enterprise was truly circumscribed or that his role was greater than he suggested during his interview with the Probation Officer and that he minimized relevant conduct. The district court, partially because it accepted Milliron's statements regarding drug quantities, credited the first scenario. "Regardless of what the members of this panel might have done had they been required to pronounce sentence on [Bell], they cannot overturn the district court's factual findings unless clearly erroneous, which these findings are not." *United States v. Lay*, 583 F.3d 436, 449 (6th Cir. 2009). This holding is even more appropriate where, as here, the district court "provide[d] some indication that [it] considered the defendant's arguments in favor of a lower sentence and the basis for rejecting such arguments," *Martinez*, 588 F.3d at 325 (citations and internal quotation marks omitted).[3] Indeed, the district court characterized this question as a "hotly contested issue" and explicitly found that "Mr. Bell denies through his counsel, denies saying that he denied assisting Mr. Milliron with the manufacture of methamphetamine [but] I don't find that denial credible, and I find the report accurate." The judgment of the district court in considering this issue is due deference and, though this is a close call, we affirm.

## CONCLUSION

---

[3]We note that the record reflects no evidence supporting Bell's version of his role in the criminal enterprise in contrast to Milliron's version. All we have before us are Bell's counsel's arguments, which are not reliable evidence. Bell possessed the PSR for quite some time before the sentencing hearing and could have sought to testify at the hearing regarding his conduct or attempted to submit a sworn affidavit stating his position on Milliron's statements or the Probation Officer's conclusions. It was, after all, his burden to prove, by a preponderance of the evidence, that the Guidelines reduction was justified, *Surratt*, 87 F.3d at 821, so his failure to proffer any reliable evidence inures to his detriment.

For the foregoing reasons, the decision of the district court is affirmed.